**REED SMITH LLP**
599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
    James C. McCarroll (JM 2758)
      Email:  jmccarroll@reedsmith.com
    Lance Gotthoffer (LG 5932)
      Email:  lgotthoffer@reedsmith.com

*Attorneys for Bart M. Schwartz, as Receiver of*
*Defendants Gabriel Capital, L.P.*
*and Ariel Fund Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                     Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                     Plaintiff,<br><br>    v.<br><br>J. EZRA MERKIN, *et al*.<br><br>                 Defendants. | Adv. Pro. No. 09-1182 (BRL) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF BART M. SCHWARTZ, AS RECEIVER OF**
**DEFENDANTS GABRIEL CAPITAL, L.P. AND ARIEL FUND LIMITED,**
**FOR LEAVE TO APPEAL THE NOVEMBER 17, 2010 MEMORANDUM**
**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART**
**<u>DEFENDANTS' MOTIONS TO DISMISS TRUSTEE'S COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 4

    A.    The Madoff Ponzi Scheme and the Funds .......................................... 4

           1.    Madoff and BLMIS.................................................................. 4

           2.    The Funds ................................................................................. 5

    B.    The Bankruptcy Court's Decision in Favor of the Trustee ................... 6

    C.    Questions Which Should Be Subject to Immediate Appeal ................... 8

ARGUMENT ..................................................................................................... 9

I.    THE STANDARD FOR LEAVE TO APPEAL.................................................. 9

    A.    The Bankruptcy Court's Order Presents Controlling Questions of Law .............. 10

    B.    There Are Substantial Grounds for Difference of Opinion .................. 11

    C.    Review of the Bankruptcy Court's Order Will Materially Advance the Ultimate Termination of This Litigation.................................. 11

    D.    The Exceptional Circumstances Present Here Cry Out For Immediate Appellate Review....................................................... 12

II.    THE BANKRUPTCY COURT'S ORDER MEETS THE STANDARD FOR OBTAINING LEAVE TO APPEAL................................................... 12

    A.    The Actual Fraud Claims Raise Multiple Questions For Appeal ......... 13

           1.    Under Section 548(a)(1)(A), The Plaintiff Must Plead Facts in the Complaint Connecting the Defendant to the Fraudulent Scheme Alleged ......................................................... 13

           2.    As a Matter of Law, the Complaint Fails to Allege Bad Faith or Fraudulent Intent on the Part of the Funds................ 15

           3.    Resolution of These Issues on Appeal Would Materially Advance the Termination of This – And Many Other – Litigations ........................................................... 19

B.    The Court Below Erred In Not Dismissing the Constructive Fraud
       Claims ................................................................................................ 19

              1.    The Transfers to the Funds Were For Value ............................................ 20

              2.    Section 546(e) Safe Harbor ...................................................................... 23

CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Bank of Woodstock (In re Alexander)*,
   248 B.R. 478 (S.D.N.Y. 2000) ................................................................. 10

*Am. Geophysical Union v. Texaco, Inc.*,
   802 F. Supp. 1 (S.D.N.Y. 1992) ......................................................... 10, 19

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ...................................................................... 7, 14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................... 7, 14

*Carrozzella & Richardson v. Zofia Deptula (In re Carrozzella & Richardson)*,
   286 B.R. 480 (Bankr. D. Conn. 2002) .............................................. 20, 24

*Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*,
   No. 09 Civ. 02577, 2010 WL 3839277 (S.D.N.Y. Sept. 17, 2010) ........................ 16, 17, 18, 23

*Churchill Mortgage*,
   256 B.R. 664 (Bankr. S.D.N.Y. 2000) ................................................... 20

*Consol. Edison, Inc. v. Northeast Utils.*,
   318 F. Supp. 2d 181 (S.D.N.Y. 2004) ................................................... 10

*Consub Del. LLC v. Schahin Engenharia Limitada*,
   476 F. Supp. 2d 305 (S.D.N.Y. 2007) ................................................... 11

*Contemporary Indus. Corp. v. Frost*,
   564 F.3d 981 (8th Cir. 2009) .............................................................. 25

*Enron Corp. v. Avenue Special Situations Fund II, et al. (In re Enron Corp.)*,
   No. 01-16034, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006) ................................ 11

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
   253 B.R. 866 (Bankr. N.D. Ill. 2000) ................................................... 22

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) ............................................................................. 25

*In re Actrade Financial Technologies Ltd.*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005) ........................................... 13, 14, 15

*In re Calpine Corp.*,
   356 B.R. 585 (S.D.N.Y. 2007) ............................................................. 9

*In re Enron Creditors Recovery Corp.*,
    422 B.R. 423 (S.D.N.Y. 2009)..................................................................... 24

*In re Enron Creditors Recovery Corp.*,
    No. 01-16034, 2009 WL 3349471 (S.D.N.Y. Oct. 6, 2009)................................... 10

*In re Image Masters*,
    421 B.R. 164 (Bankr. E.D. Pa. 2009) .................................................... 14, 15

*In re Kassover*,
    343 F.3d 91 (2d Cir. 2003) ............................................................................. 9

*In re QSI Holdings, Inc.*,
    571 F.3d 545 (6th Cir. 2009) ........................................................................ 25

*In re Stewart Finance Co.*,
    367 B.R. 909 (Bankr. M.D. Ga. 2007)............................................................. 24

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*,
    84 F.3d 1330(10th Cir. 1996), ...................................................................... 22

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
    Amministrazione Straordinaria*,
    921 F.2d 21 (2d Cir. 1990) ........................................................................... 10

*Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*,
    834 F.2nd 1134 (2d Cir. 1987) ...................................................................... 21

*Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*,
    No. 09 Civ. 3708 (TPG), 2010 WL 1257567 (S.D.N.Y. Mar. 31, 2010) .................... 16, 18, 23

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
    77 B.R. 843 (D. Utah 1987)..................................................................... 20, 21

*Paxi, LLC  v. Shiseido Americas Corp.*,
    636 F. Supp. 2d 275 (S.D.N.Y. 2009) ............................................................. 21

*S.E.C. v. Cohmad Securities Corp.*,
    No. 09 Civ. 5680 (LLS), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) .................... 16, 18, 23

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities
    LLC (In re Madoff)*,
    No. 08-01789, 2010 WL 3260074 (S.D.N.Y. Aug. 6, 2010)...................................... 9

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ............................................................... passim

*Williston v. Eggleston*,
    410 F. Supp. 2d 274 (Bankr. S.D.N.Y. 2006)..................................................... 12

*Yerushalmi v. Shiboleth*,
    405 B.R. 44 (E.D.N.Y. 2009) ......................................................................... 12

## **STATUTES**

11 U.S.C. § 741 ................................................................................................ 24

15 U.S.C. § 78eee(b)(4) .................................................................................... 5

15 U.S.C. § 78fff-2(c)(3) ................................................................................ 25

15 U.S.C. §§ 78aaa et seq. ................................................................................ 4

28 U.S.C. § 1292(b) .................................................................................. passim

28 U.S.C. § 158(a)(3)................................................................................ 1, 3, 9

Section 276 of the New York  Debtor & Creditor Law ................................ 6, 8, 9

Section 546 of the Bankruptcy Code ......................................................... passim

Section 548 of the Bankruptcy Code ......................................................... passim

## **RULES**

Federal Rules of Bankruptcy Procedure 8001 ........................................... 1, 3, 13

Federal Rules of Bankruptcy Procedure 8003 ................................................ 1, 3

## **OTHER SOURCES**

H.R. Rep. No. 109-648 (2006)......................................................................... 24

Michael Rothfeld, *Madoff Investors Brace for Lawsuits*, Wall Str. J., July 26, 2010, *available at* http://online.wsj.com/article/SB10001424052748704719104575389141620473502.html?mod= WSJ_hps_MIDDLETopStories...........................................................................2

Wright, Miller & Cooper, *Federal Practice and Procedure § 3930* (2d Ed. 1996) .................... 10

Bart M. Schwartz, as Receiver ("Receiver") of defendants Ariel Fund Limited ("Ariel") and Gabriel Capital, L.P. ("Gabriel" and together with Ariel, the "Funds"), respectfully submits this memorandum of law in support of his motion, pursuant to 28 U.S.C. § 158(a)(3) and Rules 8001(b) and 8003 of the Federal Rules of Bankruptcy Procedure, for leave to appeal the November 17, 2010 Memorandum Decision And Order Granting In Part And Denying In Part Defendants' Motions To Dismiss Trustee's Complaint (the "Order") of the United States Bankruptcy Court for the Southern District of New York (Hon. Burton R. Lifland).  *See* Exhibit 1.[1]

<h3 style="text-align:center">PRELIMINARY STATEMENT</h3>

This motion involves the fraud case of this or any other century:  the $65 billion Bernard L. Madoff Ponzi scheme.  And it is the first motion that involves the principal unsettled question of law attendant to that financial infamy:  the extent to which victims of the fraud may now be forced to return payments they received from Madoff to the SIPA Trustee plaintiff Irving Picard.

The Funds were among the biggest net losers in all of the Madoff scam.  Nonetheless, the Trustee sued them under federal and state fraudulent conveyance laws to recover an aggregate $33 million they had received from Madoff – less than 5% of their invested amounts and less than 10% of their overall losses on the Madoff investment.  In denying their motion to dismiss the Trustee's claims, the Bankruptcy Court issued at least five rulings on dispositive questions of law, ranging from whether an investor in a Ponzi scheme should suffer forfeiture not just of false

---

[1]   The Receiver was appointed as receiver of the assets of the Funds pursuant to the Stipulation and Order Appointing Receiver, dated June 10, 2009 (the "Receivership Order") entered by the Supreme Court of the State of New York, County of New York (Lowe, J).  Citations to exhibits refer to exhibits accompanying the Declaration of Lance Gotthoffer filed concurrently with this Memorandum.  Citations to "Dkt. No." refer to entries on the Bankruptcy Court's docket.

profits but of his entire principal based upon what the court, *post facto*, concludes he should have or could have known had he been paying attention to so-called "red flags"; to whether, Bernard L. Madoff Investment Securities, a registered securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, was a stockbroker for purposes of related federal statutes.  The Bankruptcy Court's resolution of these issues, in the affirmative and negative respectively, is obviously subject to legitimate and substantial difference of opinion –  indeed, its opinion stands a half century of universally settled law and the clear language of a federal statute on their respective heads – but in this remarkable case, those clear errors are <u>not</u> the most important thing.

The most important thing is, the Bankruptcy Court's decision will affect at least 19 pending adversary proceedings "seeking to recover, in the aggregate, approximately $15 billion" from Madoff victims.  Order at 4.  Indeed, the number of adversary proceedings and the amounts sought to be recovered by the Trustee has substantially increased since the Bankruptcy Court's Order.  In fact, the Trustee has commenced more than 200 new adversary proceedings in the last two weeks seeking to avoid transfers directly or indirectly from Madoff, which proceedings are predicated on legal claims identical to those sustained by the Bankruptcy Court in this case.  One of those adversary proceedings seeks more than $2 billion from UBS AG and other affiliated or related entities leading the Trustee's new barrage of clawback actions.  And even this is only the tip of the iceberg since the Trustee has indicated that he intends to commence as many as 1,000 more adversary proceedings. *See* Michael Rothfeld, *Madoff Investors Brace for Lawsuits*, Wall Str. J., July 26, 2010, *available at* http://online.wsj.com/article/SB10001424052748704719104 575389141620473502.html?mod=WSJ_hps_MIDDLETopStories.

These claims will foreseeably involve not just a thousand plus litigants, but millions of hours of lawyer time at a cost of upwards of half a billion dollars.  And they will involve not just major institutions, but individuals who, six or more years ago, may have directly or indirectly received from Madoff a hundred thousand dollars long since spent; individuals who, rather than bearing the burden and paying the costs of defending these litigations, will be forced to settle because, based on the Bankruptcy Court's Order, they have no defense.

However, if the Order is reversed on appeal, these claims would come to an end.  Thus, the precedential value of appellate review of the Order would impact not only the 19 pending adversary proceedings, but the 1,000 additional proceedings that the Trustee intends to commence – sparing untold costs and unknown hardships for a legion of investors already brutally victimized by Madoff.

For these and the other reasons explained below, the Bankruptcy Court's rulings cry out for immediate appellate review.  Those rulings satisfy the standard for obtaining leave, but most significantly, there is no just reason to delay the inevitable appeal.  Indeed, the exceptional circumstances surrounding the Bankruptcy Court's decision support an appeal as quickly as possible because if the Order is affirmed, then at least the Trustee and the defendants in the 1,000 plus adversary proceedings he intends to bring will know with certainty at the inception the legal standards that will control; and if the Order is reversed, it will not lead to a multiplication of errors as the Bankruptcy Court applies its rulings in the coming flood of proceedings over which it will preside.

Accordingly, the Receiver has filed this motion for leave to appeal, pursuant to 28 U.S.C. § 158(a)(3) and Federal Rules of Bankruptcy Procedure 8001 and 8003.

## STATEMENT OF FACTS

**A.   THE MADOFF PONZI SCHEME AND THE FUNDS**

  *1. Madoff and BLMIS*

Bernard L. Madoff Investment Securities ("BLMIS") was a New York limited liability company registered with the SEC as a broker-dealer and, as of 2005, also as an investment adviser.  Order at 5.  By virtue of its registration as broker-dealer, BLMIS was a member of the Securities Investor Protection Corporation ("SIPC").  It was run by its founder, Madoff, along with several family members and other employees.  *Id.*  BLMIS was organized into three business units: the market making unit, the proprietary trading unit, and the investment advisory business.  *Id.*

On December 11, 2008, Madoff was arrested by federal agents and charged with securities fraud.  *Id.* at 4.  Madoff pled guilty to all charges and is currently serving a 150-year prison sentence.  Madoff's fraudulent activity was perpetrated through BLMIS's investment advisory unit.  *Id.* at 5.  To facilitate his fraud, Madoff would generate customer account statements purportedly showing securities that either were held or had been traded, as well as the gains and losses in those accounts.  However, as Madoff admitted in his plea hearing, the purported trades reflected in customers' account statements never took place; rather, Madoff, along with some of his co-conspirators fabricated the fake account statements and disseminated them to BLMIS's numerous customers.  *Id.* at 6.  While several other BLMIS employees have been indicted in connection with the BLMIS Ponzi scheme, so far, no investor has been charged with any criminal wrongdoing.

On December 15, 2008, SIPC filed an application seeking a decree that the customers of BLMIS are in need of the protections afforded under the Securities Investor Protection Act of 1970 ("SIPA") (15 U.S.C. §§ 78aaa et seq.).  The District Court (Stanton, J.) granted SIPC's

application and entered an order on December 15, 2008, placing BLMIS's customers under the

protection of SIPA.  That order appointed Plaintiff as trustee for the liquidation of BLMIS's

business.  *Id.* at 5.[2]

        2.     *The Funds*

      The Funds are investment vehicles that pooled together investors' monies and made

investments on their behalf.  Ariel was incorporated in the Cayman Islands and was suitable for

non-U.S. and U.S. tax-exempt investors.  Gabriel was a Delaware partnership suitable for U.S.

taxable investors.  Other than that difference, the Funds followed the same investment strategy

and, for the most part, their investments were made *pari passu*.  The Funds were managed by

J. Ezra Merkin ("Merkin") and his investment advisory firm, Gabriel Capital Corporation

("GCC").  *See* Order at 6-7.

      The Funds had opened accounts with BLMIS at least as early as August 2000, and, in

doing so, had executed a Customer Agreement, an Option Agreement, and a Trading

Authorization Limited to Purchases and Sales of Securities and Options (collectively, the

"Account Agreements") that enabled BLMIS to effectuate trades on their behalf.  *Id.* at 7.

Throughout the years of maintaining their BLMIS accounts, the Funds transmitted more than

$150 million each to be traded in accordance with their Account Agreements.  *See* Exhibit 7 at

Exhibits J and K.  At the time of BLMIS's collapse, the Funds' account statements reflected a

balance of approximately $308 million each.  *Id.*  Throughout the years of maintaining their

---

[2] Judge Stanton's order also provided, *inter alia*, for the removal of the SIPA liquidation proceeding to the United States Bankruptcy Court for this District pursuant to 15 U.S.C. § 78eee(b)(4).

accounts, each of Ariel and Gabriel only submitted one withdrawal request.  That was in June of 2008:  $16.2 million for Ariel and $17.4 million for Gabriel.[3]

In April 2009, less than six months after the revelation of Madoff's Ponzi scheme, the Trustee brought this adversary proceeding seeking to recover the Funds' two transfers as fraudulent conveyances pursuant to the Bankruptcy Code and New York State's Debtor and Creditor Law (the "NYDCL").  In addition, the Trustee sought to disallow the Funds' customer claims in BLMIS's SIPA liquidation proceeding.  The Funds moved to dismiss and Judge Lifland's Order followed.

### B.     THE BANKRUPTCY COURT'S DECISION IN FAVOR OF THE TRUSTEE

On November 17, 2010, the Bankruptcy Court issued its Order.  In denying – for the most part – the Funds' motion, the Court made the following key rulings, each of which presents a controlling question of law that should be subject to immediate appeal.

*First*, with respect to the requirement to plead fraudulent intent to avoid a transfer under Section 548(a)(1)(A) of the Bankruptcy Code and Section 276 of the NYDCL, the court held that such allegations are subject to the stringent pleading requirements of Rule 9(b), but that a plea of fraudulent intent on the part of the debtor  – not on the part of the transferee – is all that is required under Section 548(a)(1)(A).  It further noted that courts are split as to whether, under the parallel provisions of the NYDCL, a trustee must actually plead the fraudulent intent of the transferee.  Without deciding this latter issue, the court below found that the Complaint's allegations were sufficient to satisfy the Rule 9(b) pleading standard with respect to the Funds' intent to commit fraud.  In particular, the court found that the Complaint alleges "strong

---

[3]   The Funds pointed out below that documents in the Trustee's possession showed these redemptions were made to meet redemption requests from investors in the Funds.  *See* Exhibit 8 at 17-18.  The Trustee never disputed this.

circumstantial evidence of the Moving Defendants' motive and opportunity to commit fraud or conscious misbehavior or recklessness."  Order at 18-19.  The facts supporting this finding were the returns generated by Madoff, Merkin's close relationship with Madoff, Merkin's failure to inform investors about Madoff's role, and the defendants' failure to investigate Madoff's business.

*Second*, and while relying on the same set of allegations concerning the Funds' purported knowledge, the court below rejected the Funds' effort to rely on the good faith defense of Section 548(c) at this stage of the proceeding.  While the court recognized that, in certain unrelated circumstances, an affirmative defense can be raised on a motion to dismiss when the plaintiff "pleads itself out of court by unintentionally alleging facts that establish an affirmative defense" (Order at 15), it found that this case did not fall within that precept.  Rather, the court found that the allegations in the Complaint sufficiently stated the Funds' bad faith and that the good faith defense of Section 548(c) in any event involves a factual analysis that is not properly addressed in a motion to dismiss.  *Id.*  The court below did not address the Funds' argument that the Complaint's allegations are implausible under the standards adopted by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

*Third*, the court below denied the Funds' motion to dismiss the constructive fraudulent conveyance claims the Trustee asserted under both the Code and the NYDCL, on the basis that the Complaint alleges facts sufficient to deny the Funds' right to restitution and, thus, to deny a finding that the Funds gave value to BLMIS in receiving the transfers.  In particular, the court held that the Trustee "has sufficiently pled that [defendants] were not innocent investors; rather…it is plausible that they knew or should have known of the Madoff fraud and helped to

perpetuate it." Order at 25.[4]  As a consequence, the Funds, although indisputably net losers, could be liable to forfeit the $33 million in principal repayments they received.

*Fourth*, the court below denied the Funds' request to seek dismissal of the constructive fraudulent conveyance claims on the basis of the safe harbor of Section 546(e) of the Bankruptcy Code, finding that the Funds were incorrect in their assertion that "BLMIS clearly falls within the definition of stockbroker for purposes of 546(e)" and that the Account Agreements constituted a securities contract falling within the contours of the safe harbor.  Order at 32-33. The court below also noted that applying the safe harbor in this context would be incompatible with SIPA's goals.  *Id.*[5]

### C.   QUESTIONS WHICH SHOULD BE SUBJECT TO IMMEDIATE APPEAL

As a result of the Order, the following questions are ripe for an immediate appeal as they all meet, and exceed, the standards for granting leave to appeal.  All five are examined in detail in the Argument section of this Memorandum:

1)   Must a complaint for actual fraudulent transfer under Sections 548(a)(1)(A) of the Bankruptcy Code and Section 276 of the NYDCL allege facts sufficient to connect the defendant-transferee to the alleged scheme to defraud creditors?

   *The court below held in the negative.*

2)   Can a complaint for actual fraudulent transfer under Sections 548(a)(1)(A) of the Bankruptcy Code that fails to allege facts permitting an inference the defendants acted other than in good faith within the meaning of Section 548(c) of the Code withstand a motion for dismissal under Rule 12(b)(6)?

---

[4]   The Complaint did not allege participation by the Funds in Madoff's scheme; only that, in light of their alleged knowledge, they were "on notice" of "indicia of irregularity and fraud but failed to make sufficient inquiry."  *See* Exhibit 5 at ¶ 44.

[5]   On an issue not relevant to this motion, the court below rejected the Trustee's expansive reading of SIPA that would enable the Trustee to seek a one-step turnover process of property even prior to avoiding the transfers at issue.  The court noted that "there is nothing in the plain language [of the statute or caselaw] to give such an in rem spin" to the Trustee's position.  That was the only part of the Funds' motion that the court below granted.

*The court below held in the affirmative.*

3)    In a case for actual fraudulent transfer under Sections 548(a)(1)(A) of the Bankruptcy Code and Section 276 of the NYDCL, are allegations that Madoff operated in a non- transparent manner, that a fund manager did not disclose the full extent of his relationship with Madoff, had a close personal relationship with Madoff and knew of various unproven allegations respecting Madoff and the returns he was obtaining, all originating years before the transfers at issue, sufficient to establish "fraudulent intent" on behalf of the transferee-funds in accordance with the pleading requirements of Rule 9(b)?

*The court below held in the affirmative.*

4)    Does an investor in a Ponzi scheme who has received payments of less than his principal forfeit the remainder of his principal based on a theory he had constructive knowledge of the Ponzi scheme, absent a plea or proof of facts that show actual knowledge of, and participation by the investor in, that scheme?

*The court below held in the affirmative.*

5)    Was Bernard L. Madoff Investment Securities a stockbroker or financial institution and were the payments to investors made by it pursuant to securities contracts so that the "safe harbor" of Section 546(e) of the Bankruptcy Code would preclude avoidance of any transfers on a constructive fraudulent transfer basis?

*The court below held in the negative.*

## ARGUMENT

## I.    THE STANDARD FOR LEAVE TO APPEAL

Pursuant to 28 U.S.C. § 158(a)(3), this Court has discretionary appellate jurisdiction over interlocutory orders of the Bankruptcy Court. *In re Kassover*, 343 F.3d 91, 94 (2d Cir. 2003). "While neither the Bankruptcy Code nor the Federal Rules of Bankruptcy provide standards for evaluating a motion for leave to appeal, the majority of courts have applied the analogous standard for certifying an interlocutory appeal set forth in 28 U.S.C. § 1292(b)." *In re Calpine Corp.*, 356 B.R. 585, 592-93 (S.D.N.Y. 2007) (internal quotation marks omitted); *accord*, *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC (In re Madoff)*, No. 08-01789, 2010 WL 3260074, at *3 (S.D.N.Y. Aug. 6, 2010).

Under this standard, this Court's review is warranted if (1) the "order involves a controlling question of law," (2) "there is a substantial ground for difference of opinion" on that question, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

A.     THE BANKRUPTCY COURT'S ORDER PRESENTS CONTROLLING QUESTIONS OF LAW

A "controlling question of law" is one where "either (1) reversal of the [lower] court's order would terminate the action, or (2) determination of the issue on appeal would materially affect the outcome of the litigation." *In re Enron Creditors Recovery Corp.*, No. 01-16034, 2009 WL 3349471, at *5 (S.D.N.Y. Oct. 6, 2009) (*citing Alexander v. Bank of Woodstock (In re Alexander)*, 248 B.R. 478, 483 (S.D.N.Y. 2000); *Consol. Edison, Inc. v. Northeast Utils.*, 318 F. Supp. 2d 181, 195 (S.D.N.Y. 2004); Wright, Miller & Cooper, *Federal Practice and Procedure § 3930*, at 423 (2d Ed. 1996) ("[A] question is controlling, even though its disposition might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants.").

Courts may also take into account the "impact that an appeal will have on other cases." *See*, *e.g.*, *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990); *Consol. Edison, Inc.*, 318 F. Supp. 2d at 196 (granting certification under 1292(b) where "the implications of the decision in this case are far reaching, affecting billion-dollar transactions in this case and others"); *Am. Geophysical Union v. Texaco, Inc.*, 802 F. Supp. 1, 30 (S.D.N.Y. 1992) (granting appellate review where "the shared interests of large research corporations and the publishing community would be importantly served by an immediate appeal, clarifying these questions.").

**B.    THERE ARE SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION**

There can be no doubt that there are "substantial grounds for difference of opinion" regarding the Bankruptcy Court's rulings.  A substantial ground for difference of opinion "must arise out of a genuine doubt as to whether the . . . court applied the correct legal standard," such as when there is "conflicting authority" or when the issue is "particularly difficult" and a matter of "first impression" in the jurisdiction.  *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007) (quotation marks omitted); *accord*, *Lehman Brothers Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd. (In re Lehman Brothers Special Fin. Inc.)*, Adv. Pro. No. 09-01242, at 11 (S.D.N.Y. Sept. 21, 2010) (citations omitted).

**C.    REVIEW OF THE BANKRUPTCY COURT'S ORDER WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION**

The third and final prong of the 28 U.S.C. § 1292(b) analysis is whether "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § l292(b).  Courts typically view this factor as one of significant import in determining the propriety of an appeal under Section 1292(b).  *See Enron Corp. v. Avenue Special Situations Fund II, et al. (In re Enron Corp.)*, No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006) ("*Enron*") ("Courts place particular emphasis on this last factor [under Section 1292(b)].").

This appeal seeks review of the Bankruptcy Court's decisions on a motion to dismiss — the quintessential terminal event in a litigation.  If the Order is reversed, the result will be the end of the subject adversary claims against the Funds.  For that reason, the third element of Section 1292(b) analysis is "easily met" here.  *See Enron*, 2006 WL 2548592, at *8 (holding that the

third prong under § 1292(b) is readily satisfied where granting appeal "may result in the disposition of the Adversary Proceedings in their entirety").

### D.    THE EXCEPTIONAL CIRCUMSTANCES PRESENT HERE CRY OUT FOR IMMEDIATE APPELLATE REVIEW

Some courts have super-imposed a further requirement, a showing of "exceptional circumstances."  This requires a showing of the particular circumstances that warrant a departure from the basic policy of postponing appellate review until after entry of a final judgment. *Yerushalmi v. Shibolelth*, 405 B.R. 44, 47 (E.D.N.Y. 2009); *Williston v. Eggleston*, 410 F. Supp. 2d 274, 276 (Bankr. S.D.N.Y. 2006).

The issues in this adversary proceeding are not only of enormous public import, but are substantially similar to those in a large number of other adversary proceedings pending in the Bankruptcy Court, not to mention the additional proceedings that the Trustee is contemplating. The Bankruptcy Court's ruling cries out for review, not only for the sake of the Funds but the other litigants who have been, or are about to be, subjected by the Trustee to identical claims. For that reason, immediate review of these issues is in the best interests of all parties – including the Trustee.

## II.    THE BANKRUPTCY COURT'S ORDER MEETS THE STANDARD FOR OBTAINING LEAVE TO APPEAL

Each of the five questions to be raised on appeal easily satisfies the applicable standard, both in terms of its conflict with applicable precedent and as respects the impact an appellate decision would have in the myriad of adversary proceedings and objections on claims' determination that the Bankruptcy Court will have to deal with in the aftermath of Madoff's Ponzi scheme.

A.    **THE ACTUAL FRAUD CLAIMS RAISE MULTIPLE QUESTIONS FOR APPEAL**

In upholding the Trustee's claims to avoid the transfers as intentional (or actual) fraudulent transfers (*see* Questions 1-3 *supra*), the court below rendered two separate, but interdependent, rulings on the law that should be reviewed pursuant to Rule 8001(b).

1.    *Under Section 548(a)(1)(A), The Plaintiff Must Plead Facts in the Complaint Connecting the Defendant to the Fraudulent Scheme Alleged*

*First*, the court below concluded that in a claim for actual fraudulent conveyances pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, a trustee need not dispute or negate a transferee's good faith in the complaint.  According to the court below, the issue of the defendant's good faith is purely a matter of affirmative defense under Section 548(c) of the Code, and the arguments the Funds made with respect thereto "are irrelevant to the Trustee's pleading requirements, and thus ineffective in dismissing the Trustee's code based actual fraud claims."  Order at 14-15.

But other bankruptcy courts have completely disagreed.  For example, in *In re Actrade Financial Technologies Ltd*., 337 B.R. 791 (Bankr. S.D.N.Y. 2005) ("*Actrade*"), the plaintiff-trustee did not allege a connection between the defendant and the scheme to defraud creditors pled in the complaint, and for this reason, the court found plaintiff's intentional fraudulent conveyance claim insufficient on its face.  *Id.* at 810.  Specifically, taking cognizance of the Second Circuit's decision in *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005) ("*Sharp*") construing parallel provisions of the New York State Debtor Creditor Law, the court concluded:

> There is no reason why the <u>Sharp</u> reasoning should not be
> applicable to claims of intentional fraudulent conveyance under the
> Bankruptcy Code as well, especially as the federal and state
> statutes are structured similarly, and there is no difference in

13

> burden of proof.  <u>The key point in Sharp is that intentional</u>
> <u>fraudulent conveyance claims should be relegated to their proper</u>
> <u>sphere, i.e., where there is a knowing intent on the part of the</u>
> <u>defendant [transferee] to damage creditors.  This point is as well</u>
> <u>taken under Section 548(a)(1)(A) of the Bankruptcy Code as</u>
> <u>under…the [debtor creditor law].</u>

*Actrade*, 337 B.R. at 809.  (emphasis supplied).

Moreover, as to the proper application of a § 548(c) good faith defense, the bedrock of

the decision below, the *Actrade* court stated:

> Good faith under § 548(c) is of course a defense to a claim of
> intentional fraudulent conveyance…<u>The point, however, is what</u>
> <u>the plaintiff must plead before any defenses need be raised.</u>

*Id.* at 809. (emphasis supplied).

Other bankruptcy courts have reached the same result, and have reached that result by

reasoning which, if adopted, would be similarly destructive of the lower court's conclusion.

Thus, in *In re Image Masters*, 421 B.R. 164 (Bankr. E.D. Pa. 2009), the court entertained a

Section 548(c) defense on a Rule 12(b)(6) motion and applied it to dismiss a fraudulent

conveyance claim arising from an alleged Ponzi scheme.  The court held that under *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), for a claim

to survive it must first be plausible when viewed through the prism of the court's judicial

experience and common sense.  Applying these criteria, the court concluded the trustee's

argument that the defendants should have been deemed to have known about a Ponzi scheme

because they were receiving payments on a large number of conventional loans from a single

source was disingenuous.  "Simply stated, the trustee's allegations failed to state in any way that

the defendants acted in anything other than in good faith."  *In re Image Masters*, 431 B.R. at 182.

As set forth above, this is directly in contradiction of the lower court's holding here, i.e., that it is

improper to consider or rule against plaintiff on such a good faith basis at the Rule 12(b)(6) stage.  *See* Order at 14-16.

As such, a substantial basis for difference of opinion exists on the controlling legal question of whether, to meet its initial burden under Section 548(a)(1)(A), "a plaintiff must plead the requisite intent with respect to each transfer sought to be avoided and <u>must connect the allegations against the defendant to the debtor's scheme to defraud creditors</u>."  *In re Image Masters*, 431 B.R. at 183 (emphasis supplied), *citing Sharp*, *supra* and *Actrade*, *supra*.  Thus, the first two facets of § 1292(b) are satisfied.

> 2.    *As a Matter of Law, the Complaint Fails to Allege Bad Faith or Fraudulent Intent on the Part of the Funds*

Perhaps recognizing the perilous nature of relying solely on a finding that a plaintiff need not negate defendant's good faith in a Section 548 (a)(1)(A) complaint, the court below held as an alternative ground for its denial of the Funds' motion that "the complaint is replete with…allegations that the moving defendants accepted the initial transfers in *bad faith,* with actual and constructive knowledge of the fraud."  Order at 15.  (emphasis in original.)  It appears that the allegations to which the court thus made reference were recited at pp. 9-10 of the Order, principally: (i) Madoff's consistent positive annual returns; (ii) defendants' efforts to conceal Madoff's role with respect to the Funds' investments; (iii) Merkin being warned about BLMIS's returns by a number of industry professionals and press reports; (iv) the close relationship between Merkin and Madoff by virtue of the fact they were both sitting on the Board of Trustees of Yeshiva University; and (v) BLMIS's use of a small, unknown accounting firm and its overall requirement of secrecy.

But the legal sufficiency of such averments as a predicate for inferring fraudulent intent or bad faith in the Ponzi scheme context – and, in particular, the Madoff Ponzi scheme – has

been refuted in a uniform series of decisions from this Court dismissing such claims under Rule 12(b)(6).  *See*, *e.g.*, *S.E.C. v. Cohmad Securities Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010); *Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.,* No. 09 Civ. 3708 (TPG), 2010 WL 1257567, at *6 (S.D.N.Y. Mar. 31, 2010).

Indeed, the *Cohmad* decision should be sufficient on its own to grant this motion.  In *Cohmad*, the SEC brought a fraud claim against an entity that was co-owned by Madoff and individuals that were alleged to be his closest business associates; in fact, they were working in the same offices.  The "red flags" upon which the SEC was relying to show fraudulent intent were virtually identical to the ones at issue here.  Nonetheless, Judge Stanton dismissed the complaint holding that "nowhere does the [SEC's] complaint allege any fact that would have put defendants on notice of Madoff's fraud…Rather, the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions and regulators."  *Cohmad*, 2010 WL 363844, at *2.  Moreover, with respect to BLMIS's secrecy and exclusivity, Judge Stanton commented that "anyone who watches TV commercials or reads magazine ads can attest" that "the projection of an 'aura of exclusivity' is a common marketing tactic" and not evidence of fraudulent intent.  *Id.* at *4 (internal quotations omitted).  Thus, the propriety of the lower court's reliance upon factors such as the allegedly close business and social relationship between Merkin and Madoff and the lack of transparency of BLMIS is subject to more than fair grounds for difference of opinion.

Moreover, in *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, No. 09 Civ. 02577, 2010 WL 3839277 (S.D.N.Y. Sept. 17, 2010) (Gardephe J.) ("*In re Bayou*"), this Court, sitting on appeal from a decision of the Bankruptcy Court, held that a transferee must suspect <u>fraud</u> or <u>insolvency</u> on the part of the transferor before

it can be required to establish the other elements of a Section 548(c) defense.  No other suspicion, whether of financial embarrassment, problems or undifferentiated illegality in respect of the transferor, will suffice.  *In re Bayou*, 2010 WL 3839277, at *21.

This renders meaningless the so-called "red flags" relied upon by the Trustee.  None of these can seriously be said to support the proposition that the Funds were on notice of any insolvency of BLMIS prior to the transfers they received in June of 2008 (or that those transfers were being made for a fraudulent purpose).  The fact that Madoff generated consistent returns, or that his auditor was not well known (though accepted by the Securities and Exchange Commission), or the other red flags concerning some hindsight "infirmity" respecting BLMIS's management, viewed objectively as *In re Bayou* commands, simply would not put someone on notice that BLMIS was insolvent at the time of the transfers to the Funds or that the specific transfers were being made for a fraudulent purpose.

Separately, the court below failed to recognize that the Trustee's complaint contains no allegation tying the red flags (even assuming they were legally cognizable red flags) to the two specific transfers made to the Funds – the only transfers relevant pursuant to *In re Bayou*.  That is a fatal defect under both *In re Bayou* and the plausibility standard mandated by the Supreme Court, since the Trustee's own pleading shows that Merkin, the Funds' investment advisor, continued to send money to BLMIS – $10 million – even <u>after</u> the Funds received the transfers that the Trustee seeks to avoid.  *See* Exhibit 5 at ¶ 50.

More specifically, the Complaint here discloses the following:  that the Funds, by Merkin, invested with Madoff for a period of over eight years; that in the relevant limitations period of six years, the Funds made exactly one withdrawal each from Madoff, in the total amount of $33 million, less than 5% of their overall investment as reflected on the relevant

account statements; that most of the "red flags" identified by the Trustee were alleged to have occurred years before these withdrawals, and that subsequent to the withdrawals, Merkin actually invested another $10 million with Madoff.  In other words, there was no plea of a particular new fact or event that "connected the dots" and supposedly clued Merkin to the fact that Madoff was engaged in a fraud and thus precipitated the withdrawals at issue.  As such, there was no legally sufficient basis to infer bad faith as required by the above cited authorities.

Finally, the Bankruptcy Court failed to take into consideration *In re Bayou's* holding that, even if a transferee is on inquiry notice for purposes of Section 548(c), there is no requirement for a diligent investigation if that investigation would have not uncovered facts confirming the transferor's insolvency or fraud -- the "futility exception" to the diligent investigation rule.  *In re Bayou*, 2010 WL 3839277, at *23.  BLMIS is the classic example of what a futile investigation would have been – with the Securities and Exchange Commission itself setting the standard, having examined BLMIS numerous times over the twenty years preceding discovery of his Ponzi scheme and failing to uncover any improprieties.   More importantly, however, for the purpose of appellate review, the Trustee's Complaint is devoid of any allegations with respect to what a diligent investigation of BLMIS by a reasonable person would have uncovered, because the Trustee cannot make a good faith allegation that it would have resulted in anything other than adding to the long list of inquiries into Madoff's operations already recognized by a legion of courts as preordained to fail.  *See, e.g.*, *Meridian*, 2010 WL 1257567, at *6 ("the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals"); *Cohmad*, 2010 WL 363844, at *2 ("Madoff fooled the defendants as he did individual investors, financial institutions and regulators").

Indeed, in its Memorandum of Law in Opposition to the Funds' initial motion to dismiss, the Trustee at p. 28 affirmatively argued:

> The Amended Complaint . . . amply alleges the operation of the Ponzi scheme and Madoff's steps to conceal it, <u>which were designed to and did deceive reasonable investors for decades</u>.

(emphasis supplied).  In sum, based on the Complaint's own allegations, and materials of which the Court can take judicial notice, it becomes apparent that the lower court's ruling is out of synch – or more pointedly disregards – the holdings not only of co-ordinate Bankruptcy Courts but of this Court as well, and that immediate appellate review is warranted.

       *3.*    *Resolution of These Issues on Appeal Would Materially Advance the Termination of This – And Many Other – Litigations*

As to the final facet of Rule 8004 and § 1292 (and the uncodified "exceptional circumstances" rule,) if the Court were to take these collective issues and resolve them, as so many other courts apparently would resolve them, in the Funds' favor, then it is fatal to all or substantially all of the Trustee's claims; and, <u>per force</u>, it would be fatal to numerous claims that the Trustee has brought or anticipates bringing.  Absent permission now to appeal, those fatal flaws may not be discerned until years of litigation and millions of dollars in fees are borne by a generation of Madoff victims.  Accordingly, all of the relevant criteria are met and leave to appeal should be granted.

    **B.**    **THE COURT BELOW ERRED IN NOT DISMISSING THE CONSTRUCTIVE FRAUD CLAIMS**

The lower court's rejection of the Funds' arguments in favor of dismissal of the constructive fraudulent conveyance claims (Order at 23-34) raises two additional questions ripe for immediate appeal.  The first one, whether redemptions of principal constitute reasonably equivalent value, is a paramount issue concerning <u>every</u> Ponzi scheme.  Simply stated, if the answer is no it means that every investor in a Ponzi scheme may not only lose his phantom

profits, but his actual paid in principal as well.  Thus, even an investor who is a net loser may be

required to litigate and potentially reach into his pocket to repay any amounts he received back

from the scheme, even if but a fraction of his overall investment, and even if he was not alleged

to be an active participant in the scheme.  The second question, the application of the safe harbor

of Section 546(e) of the Bankruptcy Code, if resolved as the Funds suggest, would immediately

end *all* pending clawback claims arising from the Madoff scheme predicated on a constructive

fraud theory, leaving intact, of course, those claims that are properly predicated on a theory of

actual fraud.

### 1.      The Transfers to the Funds Were For Value

The lower court's ruling that the Funds did not receive the transfers for "value" because

they acted in bad faith (and therefore cannot even retain repayments of principal they received) is

subject to appeal on three independent grounds.

*First*, in the context of an alleged Ponzi scheme, courts in this Circuit, if not in every

Circuit, have consistently recognized that a debtor receives reasonably equivalent value in

exchange for all transfers to an investor that do not exceed the investor's principal undertaking,

so that only "false profits" are subject to clawbacks.  *See, e.g., Churchill Mortgage,* 256 B.R.

664, 682 (Bankr. S.D.N.Y. 2000) (recognizing the "universally-accepted rule that investors may

retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments

…"); *Carrozzella & Richardson v. Zofia Deptula (In re Carrozzella & Richardson),* 286 B.R.

480, 487-88 (D. Conn. 2002) ("[W]hen facing fraudulent conveyance actions, investors may

keep the principal amount of their investments, but they may not keep any profits from the

scheme") (internal quotations omitted); *see also Merrill v. Abbott (In re Indep. Clearing House

Co.)*, 77 B.R. 843, 857 (D. Utah 1987) (holding that payments that did not exceed the investor's

principal investment were not avoidable under Section 548(a)(2) because the debtors received

"reasonably equivalent value").

This is as it must be. As one court analyzing this issue explained:

> From the time a defendant entrusted his money to the debtors, he
> had a claim against the debtors for the return of his money. We
> believe that the Code's definition of "debt" and its related terms is
> broad enough to cover the debtor's obligation to return a
> defendant's principal undertaking, whether that obligation was
> based on the contract between the debtors and the defendant or was
> based on the defendant's right to restitution ….Thus, to the extent
> the debtor's payments to a defendant merely repaid his principal
> undertaking, the payments satisfied an antecedent "debt" of the
> debtors, and the debtors received "value" in exchange for the
> transfers. Moreover, to the extent a transfer merely repaid a
> defendant's undertaking, the debtor received not only a
> "reasonably equivalent value" but the exact same value – dollar for
> dollar.

*In re Indep. Clearing House*, 77 B.R. at 857 (internal citations omitted). But as may be seen,

(Order at 24-26), the court below ignored – indeed, trampled upon – this well-settled rule.

*Second*, the Funds also had a contractual and legal right to the dollar-for-dollar return of

the money they had deposited in their BLMIS brokerage accounts. *See Men's Sportswear, Inc.

v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2nd 1134, 1141 (2d Cir. 1987) ("It is

well settled that if the plaintiff has made money payments to the defendant, and there is a failure

of consideration whereby defendant materially breaches the contract, the plaintiff can maintain

an action for restitution of the money so paid to the defendant…"). The Account Agreements

required BLMIS and Madoff to use the money deposited into the Funds' accounts to trade in

securities, and BLMIS and Madoff breached those agreements by failing to conduct the

authorised trading. Thus, the Trustee's own allegations establish that the Funds had, at a

minimum, breach of contract claims in the amount of their principal deposits. *See Paxi, LLC  v.

Shiseido Americas Corp.,* 636 F. Supp. 2d 275, 281-82 (S.D.N.Y. 2009) (breach of contract

claim is established by "the existence of an agreement", performance of such agreement by the plaintiff, breach by the defendant and damages).  In accordance with well-settled law (as described above), albeit law that the court below ignored, the Funds provided BLMIS with "reasonably equivalent value" for the transfers because those payments of principal partially satisfied and extinguished the Funds' contract claims.

*Third*, the Bankruptcy Court confused the inquiry notice standard sufficient to support a fraudulent transfer claim with the standard of knowledge and participation required to reject a transferee's claim.  The latter pertains only to instances of claims submitted by co-conspirators or parties that provided active assistance to the perpetrator of the fraud and have actual knowledge of the fraud.  *See Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 878-79 (Bankr. N.D. Ill. 2000).  Here, the Trustee cannot in good faith allege that the Funds had actual knowledge of the fraud.  Nor has there been any other evidence suggesting that the Funds somehow were active participants in the fraud.  The best the Trustee can do is allege that the Funds missed red flags – even though other courts have declined to characterize similar allegations as red flags.  In short, if the Order stands, any investor who missed indicia of fraud because of naiveté, carelessness, or even greed, would stand to lose everything as punishment.  Despite the holding below, however, that is not the law.  Even if the Funds acted negligently or were on notice of BLMIS' fraud at the time of the transfers, the Funds would – and should – still retain their restitution claims.  *See*, *e.g.*, *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1342 (10th Cir. 1996), *cert. denied*, 519 U.S. 1040 (1996) (holding that only sufficient evidence to establish "actual knowledge" of fraud could nullify restitution claim).

Finally, although the New York constructive fraudulent conveyance statute defines the term "fair consideration" to include "good faith," the Second Circuit in *Sharp* recognized that

22

good faith is "an elusive concept in New York constructive fraudulent conveyance statute" and expressly held that the transferee's "knowledge of the [] fraud., without more, does not allow an inference that [the transferee] received the [transfer] in bad faith." 403 F.3d. at 54, 56. Rather, the Second Circuit suggested that a finding of bad faith requires that the transferee <u>participate</u> in the underlying fraud. *Id.* at 55-56. Here, the Complaint is devoid of any allegations concerning the Funds' participation in BLMIS's fraud – other than the conclusory allegations rejected by *Cohmad*, *In re Bayou*, and *Meridian*.

In short, there is ample authority that is contrary to the decision of the court below. Moreover, resolution of this issue would apply with equal force to constructive fraud claims against all BLMIS's investors insofar as their withdrawals were withdrawals of principal, and allay the concerns of numerous net losers who did not actively participate in the fraud that they may nonetheless be forced to pay to the Trustee principal payments they received from Madoff.

## 2. *Section 546(e) Safe Harbor*

The Bankruptcy Court's finding that the safe harbor of Section 546(e) of the Bankruptcy Code is inapplicable here also raises serious questions with respect to its interpretation of the safe harbor language. As a starting point, the court's finding that BLMIS may not be a "stockbroker" within the meaning of the safe harbor is – with all due respect – unsustainable *ab initio*. The only reason BLMIS's liquidation is under the auspices of SIPC and pursuant to the requirements of SIPA is because BLMIS was a stockbroker. There was no basis, therefore, for the court below to reach a finding that BLMIS was a stockbroker for SIPA purposes but not for the purposes of the safe harbor.

Separately, the lower court erred in finding that the Account Agreements – upon which the Trustee relied in commencing this adversary proceeding – did not constitute "securities contracts." Order at 32. Section 741(7) defines the term "securities contract" broadly to include

not only "a contract for the purchase [or] sale ... of a security ..., including an option to purchase or sell any security," 11 U.S.C. § 741(7)(A)(i), but also "any other agreement or transaction that is similar to an agreement or transaction" listed in Section 741(7)(A)(i)-(vi).  11 U.S.C. § 741(7)(A)(vii).  Further, the term "settlement payment," which also is defined broadly, includes "any payment in settlement of a securities transaction."  *See, generally, In re Stewart Finance Co.*, 367 B.R. 909, 917 (Bankr. M.D. Ga. 2007) ("As suggested by this definition, the term 'settlement payment' should be interpreted very broadly."); *In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 433-34 (S.D.N.Y. 2009); 11 U.S.C. § 741(8).

Moreover, Section 546(e) was amended in December 2006 to expand Section 546(e)'s protection to include, in addition to "settlement payments" and "margin payments," any "transfer" made by or to a stockbroker or financial institution "in connection with a securities contract." 11 U.S.C. § 546(e); H.R. Rep. No. 109-648, at 8 (2006) ("Section 5(b) amends Sections 546(e) and 546(f) of the Bankruptcy Code, which protect margin payments and settlement payments, *to also protect transfers made by or to a* commodity broker, ... [or] stockbroker ..., in connection with a securities contract, commodity contract, forward contract, or repurchase agreement.") (emphasis supplied).  Thus, even if there were any basis to support the lower court's holding prior to 2006, these amendments expanded the application of the safe harbor and broadened the scope of the payments and transfers covered.  The Order clearly ignores this expansion.[6]

---

[6]   The court below took issue with the fact that Madoff allegedly did not execute any trades.  Order at 32-33.  However, that is irrelevant with respect to the application of the safe harbor.  Each payment to and from BLMIS was in connection with a contract (*i.e.*, the Funds' Account Agreements) to buy and sell securities.  These contracts did not disappear because BLMIS turned out to be a massive Ponzi scheme.  If that were the case, then there would be no purpose served by statutorily enacted safe harbors, like the one in Section 546(e).

Finally, there was no basis for the court below to reject the literal language of Section 546(e) and apply the statute narrowly because it was supposedly "contrary to the purposes of the safe harbor provision and incompatible with SIPA."  Order at 33.  The Supreme Court has instructed courts to enforce the plain text of a statute "according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); s*ee also Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009); *In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir. 2009).  And the safe harbor's provision – applied as the Statute prescribes and the Funds posit – would not be inconsistent with SIPA, because SIPA only permits the Trustee to avoid a transfer "to the extent that such transfer is voidable or void under the provisions of title 11 …"  15 U.S.C. § 78fff-2(c)(3).  Section 546 clearly does not authorize the Trustee to avoid the Transfers, and there was no basis for the court below to depart from the language of the statute.

**CONCLUSION**

For the foregoing reasons, the questions raised by the Funds involve controlling questions of law, the resolution of which will expedite the disposition of these – and countless other – adversary proceedings.  Accordingly, the Court should grant the Funds' motion and allow an immediate appeal from the Order below.

Dated:  December 1, 2010
        New York, New York

                                    **Reed Smith LLP**


                                    By: /s/ James C. McCarroll
                                    James C. McCarroll (JM 2758)
                                    Lance Gotthoffer (LG 5932)

                                    599 Lexington Avenue, New York, NY  10022
                                    Telephone:  (212) 521-5400
                                    Facsimile:  (212) 521-5450

                                    *Attorneys for Bart M. Schwartz, as Receiver of*
                                    *Ariel Fund Limited and Gabriel Capital L.P.*